MRS. NETTIE RIDOUT *v.* THE STATE.

(*Nashville,* December Term, 1929.)

Opinion filed July 14, 1930.

BATES, SHEA & FRAZER, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for defendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Appealing from a conviction for voluntary manslaughter, plaintiff in error challenges the validity of the indictment on the ground that the trial judge was not qualified to act on the day when he organized the grand jury. Certain other errors assigned have been considered, but found without merit, and this opinion is confined to the single question above stated.

The terms of the Shelby County Criminal Court, three a year, open on the third Mondays of January, May and September. Unless earlier adjourned each term runs until the opening of the succeeding term.

It appears that the regular judge was "absent on account of illness" on the 12th day of December, 1928, and on that day an election by the members of the local bar in attendance was duly held and the Honorable Phil Wallace was regularly elected, pursuant to section 5730 of Shannon's Code (Acts of 1870, Chap. 78), to preside during the absence on account of illness of the regular judge.

On the 16th day of the following month, January, Judge Wallace, continuing to preside during the absence of the regular judge, opened the January term of the court without objection and empaneled and instructed the grand jury, which was duly sworn and later returned the indictment in this case. At a later day, in March following, the trial was had by a jury regularly empaneled and sworn and before a judge whose right to preside at that time is in no way questioned. The validity of the indictment only is attacked and this attack is directed and *confined* to the insistence that the authority of Judge Wallace to sit and act instead of the regular judge expired with the closing of the September term during which he had been elected, and that indictments returned by the grand jury thus unlawfully empaneled and instructed are void.

The pertinent parts of Section 5730 of Shannon's Code read as follows:

"When, from any cause, the judge of any court of record in this State, except the Supreme Court, fails to attend, or, if in attendance, cannot properly preside in a cause or causes pending in such court, or is unable to hold the court, a majority of the attorneys of the court

who are present and are residents of the State, shall elect one of its [their] number then in attendance to hold the court for the occasion, who shall have all the qualifications of a judge of such court, and who shall accordingly preside and adjudicate.

"(2) The person elected shall, during the period that he acts, have all the powers, and be liable to all the responsibilities, of a regular judge."

It will be seen that the special judge so elected is "to hold the court for the occasion," and that "the person elected shall, during the period that he acts, have all the powers, and be liable to all the responsibilities, of a regular judge." The "occasion," or contingency, which arose in the instant case, justifying an election under the statute, was the absence on account of illness of the regular judge. "Occasion" is defined as "a condition of affairs;" or as "a juncture entailing need;" an "exigency," or "a juncture affording ground or reason for something."

The constitutionality of the statute above quoted was passed upon and approved in the early cases of *Ligon* v. *State*, 3 Heisk., 159, *Hundhausen* v. *Insurance Co.*, 5 Heisk., 703, and *Halliburton* v. *Brooks*, 7 Baxt., 318. It was recognized in those cases that the intention of the legislature was to make provision for filling a vacancy in an office during the temporary absence or disqualification of the regular judge only, it being contemplated that the authority of the special judge thus elected would expire with the expiration of the occasion or exigency calling for his election. And, in this connection, in the Ligon case Judge FREEMAN remarked: "We can see no objection to making this appointment by the members of the Bar. It no more contravenes the 'principle' of uni-

versal suffrage and election of all officers by the people, as insisted by counsel, than would an act of the legislature which should provide for the appointment of a person to hold the court by the Governor. The members of the Bar are interested in selecting the best man for the place, and certainly are better qualified to judge of the fitness of the party who may be selected by them, than the Governor of the State, who may know nothing on the subject." And in the Hundhausen case he said, "we can see no better mode of meeting the exigency than the one provided by the statute." And so Judge DEADERICK, in the Halliburton case, commented to the same effect.

■ In *Harris* v. *State,* 100 Tenn., p. 287, it was held that a special judge selected under this statute to preside in the absence of the regular judge may try and dispose of criminal, including capital cases, as well as civil cases.

■ This Court in *Low* v. *State,* 111 Tenn., 81, held that the authority of a special judge chosen under this statute expires with the particular term of court during which he is elected. It is insisted that the language of that opinion in giving construction to the word "occasion" comprehends every case of election under this statute, and that upon that authority the power of Special Judge Wallace to act ceased with the September term, and that his action in organizing the grand jury on the opening day of the following term was void.

Just here, as emphasizing the vital importance of the issue presented, it is significant that the grand jury organized under the direction of this presiding judge returned not only the indictment in the case at bar, but a great number of others, and that this same judge presided at the trial of numerous cases, resulting in convictions on the one hand and acquittals on the other, his authority being recognized without question or objection

by the Bar, the litigants, court officials, including the regular judge, and the public.

Now, conceding that the election of this special judge was for the September term only, and that when, on the opening day of the succeeding term, he organized the grand jury, his term of office had expired, was he not, while thus holding over, in good faith believing himself to have continuing authority, and acting with general acquiescence and with all the indicia of reputation, a judge de facto, and his acts therefore beyond collateral attack by those third parties affected?

█ The general definition of an officer de facto, as expressed by Lord Ellenborough in *Rex* v. *Bedford Level*, 6 East 356, is "an officer de facto is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." This definition has been generally approved in this country and in England. Bouvier defines de facto, "in fact; actually; indeed." Another brief definition given by the Supreme Court of Wisconsin, is, "A de facto officer is one who is in possession of an office, and discharging its duties under color of authority." *State* v. *Oates*, 86 Wis. 634. And that court adds: "By color of authority is meant authority derived from an election or appointment, however irregular or informal, so that the incumbent be not a mere volunteer."

█ In *Wright* v. *Mattison*, 18 How., 50, 15 L. Ed., 280, color of title is defined to be that which "in appearance is title, but which in reality is no title." The difference between the basis of the authority of a de jure officer, and that of a de facto officer is that one rests on right, the other on reputation. It may be likened to the difference between character and reputation. One is the truth of a

man, the other is what is thought of him. Mr. Justice MARSHALL, in his learned opinion in *Ekern* v. *McGovern,* 154 Wis., 157, 142 N. W., 595, 46 L. R. A. (N. S.), 796, declares the American view to be, that it is color of authority, not color of title, which distinguishes an officer *de facto* from a usurper, citing cases, and Throop Pub. Off., Sec. 623 and Mechem Pub. Off., Sec. 317. And the modern rule treats "color" as the equivalent of appearance only, without reference to source.

In *Heard* v. *Elliott,* 116 Tenn., at page 157, Mr. Justice NEIL approves and adopts this statement of the rule, laid down by the Supreme Court of Oregon in the leading case of *Hamlin* v. *Kessafer,* 15 Ore., 456, 15 Pac. 778, 3 Am. State Rep., 176, a case of holding over by a judge of an inferior court after expiration of his term: "The color of right which constitutes one an officer *de facto* may consist in an election or appointment, or *in holding over after the expiration of one's term,* or acquiescence by the public in the acts of such officer for such length of time as to raise the presumption of colorable right by election or appointment." We have italicised the alternative most directly applicable to the instant case.

In 22 R. C. L., 598, the rule is thus laid down:

"Where an officer under color of right continues in the exercise of the duties of the office after his term of office has expired, or after his authority to act has ceased, he is an officer *de facto,* although he has no right to hold the office as against the one rightfully chosen his successor."

To the same effect is 23 Cyc., pages 619-20.

In Am. & Eng. Ency. of Law, VIII, page 796, treating of *de facto* Public Officers, under the sub-head "Holding Over," the rule is thus stated: "As a general rule, one who comes into office legally, and continues to hold pos-

session of the office and exercise the functions and duties thereof after the term for which he was elected or appointed has expired, is an officer *de facto.*" Supporting authorities are cited from many states, among them, *Cary* v. *State,* 76 Ala., 78; *Hale* v. *Bischoff,* 53 Kan., 301; *Brown* v. *Lunt,* 37 Me. 423; *Petersilea* v. *Stone,* 119 Mass., 465, 20 Am. Rep., 335; *Magneau* v. *Fremont,* 30 Neb., 843, 27 Am. St. Rep., 436; *Dugan* v. *Farrier,* 47 N. J. L., 383; *People* v. *Kings County,* 89 Hun (N. Y.), 38; *Gilliam* v. *Reddick,* 4 Ired. L. (26 N. Car.), 368; *Kreidler* v. *State,* 24 Ohio St., 22; *Hamlin* v. *Kassafer,* 15 Ore., 456, 3 Am. St. Rep., 176; *Com.* v. *Waller* (Pa. C. Pl.), 28 W. N. C. (Pa.), 252, 8 Lanc. L. Rev., 276, 48 Leg. Int. (Pa.), 312, 10 Pa. Co. Ct. Rep., 111; *Galbraith* v. *McFarland,* 3 Cold. (Tenn.), 267, 91 Am. Dec., 281. Also see *Prescott* v. *Haynes,* 46 N. H., 56, holding that the acts of a Justice of the Peace, although after removal, are valid as to third parties.

 It will be observed that we have here no question as to the regularity and validity of the appointment or election at the September term of this special judge for the occasion of the illness of the regular judge, and that our statute expressly provides that one so elected, "shall, during the period that he acts, have all the powers and be liable to all the responsibilities, of a regular judge." No distinction can therefore be taken between the hold over status of a regular judge and one thus elected. Nor is there room for the application of an exception sometimes made where one holds over under a claim of right after a successor has qualified and taken possession of the office, as in *Steinback* v. *State,* 38 Ind., 483. In the instant case the regular judge continuing ill had not resumed the bench and the exercise of the office. It is not a case of two judges in fact. One only was in possession

for the time and exercising the functions of the office. Assuming that the regular judge had the right to resume the bench at the time in question, and thus terminate the holding and authority of the special judge, even as a judge *de facto,* he had not done so. The situation is analogous to those cases in which one holds over and conducts the office after the election and the term of his successor begins, until qualification of such successor. Examples of cases holding the hold over a judge *de facto* under such conditions are numerous, among them, *Threadgill* v. *Carolina Cent. R. Co.,* 73 N. C., 178; *State* v. *Lee,* 35 S. Car., 192; *Cook* v. *State,* 91 Ala., 53; *Magneau* v. *Fremont,* 30 Neb., 843, 27 Am. State Rep., 436. To the same effect, with the single qualification, met in the instant case, that the judge holding over and acting did so in good faith, are *Cromer* v. *Boineet,* 27 S. C., 436, and *Merced Bank* v. *Rosenthal,* 99 Cal., 39. To the same effect, applying those principles to the case of a notary, is *Smith* v. *Meador,* 74 Ga., 416. This difference between a holding over in good faith, and one with knowledge of the expiration of the term, which latter situation has sometimes been held to justify the application of the usurper rule, is made the basis of determinative distinction in Missouri. Compare *Fleming* v. *Mulhall,* 9 Mo. App., 71, and *State* v. *Perkins,* 139 Mo., 106.

 Reference is made to *State* v. *Hart* (Mont.), reported in 7 A. L. R., 1678, and to *State ex rel. Van Amringe* v. *Taylor* (N. C.), 12 L. R. A., 202, as supporting "the theory of usurper, whose acts are void. The situations dealt with in those cases are essentially different from that before us. The Hart case is an illustration of the distinction generally recognized as vital between the right of one claiming recognition under the *de facto* rule to assert, *on direct attack,* his claim to hold the office, or

to recover compensation,—and the right of third parties affected to question collaterally the validity of acts of a *de facto* officer. Holding in that case that the relator, who had been appointed to the legislature by the Governor contrary to constitutional provisions, "was at most a *de facto* officer," the court, denying his claim to recover compensation, said: "It is a generally recognized rule that a *de facto* officer cannot recover compensation annexed to the office, and that, *while the acts of such officer are valid so far as they concern the public or the rights of third persons,* when he sues in his own right . . . he must show that he is an officer *de jure,*" citing authorities. We have italicised particularly pertinent language.

And in this connection it is of interest to observe that the recognition by that court of one as a *de facto* officer, whose acts are valid as to third parties, although holding office in the teeth of the constitution,—certainly an extreme situation,—is directly sustained in this State. In *Blackburn* v. *State,* 3 Head, 689, the facts were that the Governor had appointed a Circuit Judge who was under the constitutional age limit of thirty years. The defendant filed his plea in abatement setting up this incompetency, which on demurrer was not sustained. This court, speaking through CARUTHERS, J., said: "It is true the Constitution requires a Circuit Judge to be thirty years of age. But if the appointing power confers the office upon one who is not competent, by that test the question is as to the effects upon his judgments, while he occupies and acts in the position. We think it well settled that the judgments and official acts of an officer *de facto,* are binding and valid and the competency of the functionary acting under commission cannot be in-

quired into by parties affected by them. This principle was adopted through necessity to save the rights of persons having an interest in them, and to prevent a failure of justice." After remarking that argument and cita-tions were unnecessary on this point, in view of previous holdings, the court added: "He may be removed from the office, and his powers terminated by the proper proceedings, but until that is done, his acts are binding."

Having in mind "this principle," and the reasons underlying it, we find it impossible to distinguish—and no authority does—between the binding effect on third parties to be given the acts of one once regularly authorized to discharge official duty who holds over, and in unbroken continuity functions, in honest belief of authority; and that to be given the judicial acts of one appointed and performing in disregard of a positive inhibition of the constitution.

In *Van Amringe* v. *Taylor, supra,* an election contest case, the court found that one Thomas, who had assumed to act as registrar, without shadow of original authorization, "fraudulently got the registration books from the registrar under the false promise to return the same," etc. He was repudiated as a *de facto* officer. On the facts appearing he was assigned to the usurper class. Here there was no even colorable election and induction into office *ab origine,* and no reputation growing out of continued exercise of its duties, or element of acquiescence. Reviewing authorities, the court says: "A mere intruder or usurper is not ordinarily, but may become, an officer *de facto.* This can happen only by the continued exercise of the office by him, and the acquiescence therein by the public authorities and the public for such length of time as to afford to citizens generally a strong pre-

sumption that he had been duly appointed. But where, without color of authority, he simply assumes to act—to exercise authority as an officer—and the public know the fact, or reasonably ought to know, that he is a usurper, his acts are absolutely void for all purposes." In *Turney* v. *Dibrell*, 3 Baxt., at page 238, DEADERICK, J., thus states the case of a usurper:

"The Governor has, by law, power to appoint Chancellors in certain contingencies, and if he appoints, upon the assumption of the existence of circumstances which authorize the act, his appointee will take the office under color of title, his acts will be valid as an officer *de facto,* or one who is exercising the functions of his office under the forms of law and color of title.

"The Governor commissions judicial officers, and in the case of *Blackburn* v. *The State,* 3 Head, Judge CARUTHERS uses this strong language: "The competency of a functionary acting under the commission of the Governor, cannot be inquired into by parties affected by his official acts." Again he says, speaking of the validity of the acts performed by one exercising the functions of an office and irregularities in his office, "all those questions are settled and closed by the Governor's commission," 5 Sneed, 514. On the other hand, if one assume to discharge the duties of an office, which has no existence by law, or to exercise the functions of an office not legally created, and purports to derive his authority in the latter case from a power which, under no circumstances, can legally confer it, he is an usurper, performing official duties under no forms of law, or color of title, and his acts are of no validity. For the case under consideration, the Governor appointed and commissioned the officer. The law confers upon him the power to do so in

certain circumstances, whereby his appointee may become an officer *de jure.* If he commissioned under circumstances not authorized by law, he may, nevertheless, be an officer *de facto,* but not *de jure,* because of the irregularity or want of authority under the particular circumstances."

*Prescott* v. *Haynes, supra,* and *Beincourt* v. *Parker,* 27 Tex., 558, are cited for the general statement that "the acts of a usurper are void." It is true that in the Prescott case the court did remark, in passing, that "the acts of a mere usurper are void in all respects; "but," the court proceeded, "the acts of an officer *de facto* are valid, when they concern the public, or the rights of third persons who have an interest in the acts done, and the title of such an officer cannot be inquired into in any proceedings to which he is not a party."

"Such an officer may act under those who have a legal right to appoint, but by an irregular or informal appointment; or he may have a regular and sufficient appointment, but may not have been duly qualified to perform his duties under it; or he may have removed, as in this case, and become, perhaps, disqualified to act, if his authority was being inquired into by the State, who gave him his commission, in a proceeding directly against him; yet so long as he has not been removed, nor his authority revoked; and when he is doing business in the county, and acting as magistrate, claiming authority under his commission, which is still in life, this must be construed to give him some color of title; and when such an officer acts under color of title, his acts, when not expressly delared void by statute, though the performance of them may be punishable by a penalty, are in all cases, when coming in question incidentally, and as to third persons,

held to be valid." The opinion concludes with citation of a long list of authorities from various jurisdictions.

*Beincourt* v. *Parker, supra,* is one of the very few reported cases wherein an act of one assuming to be an officer was held invalid. A deposition was suppressed upon a showing made below that the notary who took the acknowledgment in May of one year had vacated his office the previous August. The court recognized fully the *de facto* rule, but said, "Having ceased to be *de jure* a notary public for sometime previous to taking this deposition, it cannot be pretended that this single act, which is all that it is shown he attempted to do in this capacity, will constitute him a notary public *de facto*," Essential elements of the *de facto* status were lacking, particularly continuity and reputation.

 It is obvious that none of these elements of usurper appear in the case at bar. On the contrary, we have here an actual and undisputed possession of office for the time, and not only a colorable, but a valid election and induction into office *ab origine;* also, a good faith belief in the right to exercise authority; and, also, acquiescence by litigants, the bar, all court officials and the public, coupled with the pertinent reputation. Given a *de jure* court, no case has been found in this country, or in England, wherein, under these conditions, a collateral attack by litigants affected by the acts of a judicial officer has been sustained.

 In *Venable* v. *Curd & White*, 2 Head, 582, a leading Tennessee case, WRIGHT, J., in the course of an opinion vigorously applying the *de facto* rule to judicial acts, declares that, "In England, upon a writ of error, the question whether the judges in the court below are properly judges or not, can never be decided; it being sufficient if

they were judges *de facto.*" And he says further: "There can be no doubt whatever, upon reason and authority, that a judgment given by a judge *de facto,* sitting and holding a court at the proper time and place, is as valid and free of error as a judgment pronounced by a judge rightfully in office." Says he, "the consequences of holding a contrary doctrine would be alarming, and it is very easy to see the most serious results would follow." Elsewhere in the opinion he stresses the distinction, already discusssed, between the rule where the act is for the benefit of the officer, or where he is asserting rights, and that prevailing universally where the acts of the officer concern the public or interested third parties.

Under the subhead "Acting after expiration of term," in an exhaustive note in 140 Am. State Reps., p. 178, it is said: "Where an officer continues in the exercise of the duties of the office after his term of office has expired, or after his authority to act has ceased, he is an officer *de facto,* and the validity of his official acts cannot be questioned collaterally."

Among the great number of cases from many jurisdictions cited by the Annotator, who cites none *contra* to this general rule, is *Haley* v. *Tipton,* 2 Head, 403, wherein the act of a registrar after vacating his office by removal from the State was held "valid and effectual, upon the principle that it was the act of an officer *de facto,* acting under color of office." In *Galbraith* v. *McFarland,* 3 Cold., 267, cited for the same rule by Am. & Eng. Ency. of Law, *supra,* the holding is thus summarized in the headnote: "An act performed by a clerk of the Circuit Court, after the term for which he was elected has expired by its own limitation, is valid. He was an officer *de facto,* and his official acts, so far as they affected the rights of third persons and the public, are as

effectual and valid as if performed by an officer *de jure*." The opinion by MILLIGAN, J., cites 2 Kent's Com., 295; *Farmers & Merchants Bank* v. *Chester,* 6 Humph., 458; *Bates* v. *Dyer,* 9 Humph., 163 (a sheriff), and *Pearce* v. *Hawkins,* 2 Swan., 87.

In 22 R. C. L., p. 598, it is said: "Where an officer under color of right continues in the exercise of the duties of the office after his term of office has expired, or after his authority to act has ceased, he is an officer *de facto*," citing among other authorities *Hamlin* v. *Kassafer, supra,* and *Ekern* v. *McGovern, supra.* In the Ekern case Mr. Justice MARSHALL used this language:

"One would assume from examination of the many cases preceding *State ex rel. Jones* v. *Cates,* and the many others subsequent thereto, that there could hardly be conceived a situation of an office *de jure,* and an entry and retention in good faith with all the environments of an officer of that character, without the person in possession being at least an officer *de facto* until such time as an adjudication of his title should occur."

In *Manning* v. *Weeks,* 139 U. S., 504, 35 L. Ed., 265, the Supreme Court of the United States reviewed a judgment of the Supreme Court of Wisconsin, sentencing Manning for manslaughter, it being contended that the person before whom he was tried was neither a *de jure* nor a *de facto* judge of the trial court. Holding that the judge who tried and sentenced Manning was at least a judge *de facto* and the sentence, therefore, valid, the judgment was affirmed, and the court quoted with approval from *Re Burke.* 76 Wis., 357, 363, as follows: "If the office has been lawfully established, and a person exercises the functions thereof by color of right, but whose election or appointment thereto is illegal, his official acts therein cannot be successfully attacked in collateral pro-

ceedings, but in all such proceedings will be valid and binding until the officer is ousted by the judgment of a court in a direct proceeding to try his title to the office.'' The court cites, among others, the leading case of *Norton* v. *Shelby County,* 118 U. S., 425, 30 L. Ed., 178. While holding in that case that there was no office to fill, either, *de facto* or *de jure,* the question of whether or not there was an office in existence being primarily involved, the court discussed at length, reviewing many authorities, the *de facto* rule, and among other things said: ''Where an office exists under the law, it matters not how the appointment of the incumbent is made, so far as the validity of his acts are concerned. It is enough that he is clothed with the insignia of the office, and exercises its powers and functions.'' The opinion quotes with approval from Mr. Justice MANNING of the Supreme Court of Michigan, in *Carleton* v. *People,* 10 Mich., 259, as follows: ''All that is required when there is an office to make an officer *de facto,* is that the individual claiming the office is in possession of it, performing its duties and claiming to be such officer under color of an election or appointment, as the case may be. It is not necessary that his election or appointment be valid, for that would make him an officer *de jure.* The official acts of such persons are recognized as valid on grounds of public policy, and for the protection of those having official business to transact.'' Quotation is made from *Clark* v. *Commonwealth,* 29 Pa., 129, as follows: ''It was contended that the Act of the Legislature was equivalent to an appointment of a judge for that county, and therefore unconstitutional. The Supreme Court held that, admitting the law to be unconstitutional, the judge was an officer *de facto* and that the prisoner could not be heard to deny it.'' The Tennessee case of *Blackburn* v. *State, supra,* is cited with

approval for the proposition "that the illegality of an appointment to a judicial office does not affect the validity of the acts of the judge."

In *Ball* v. *U. S.*, 140 U. S., 118, 35 L. Ed., 377, a conviction for murder, wherein it was insisted that the authority of the presiding judge specially appointed to fill a temporary vacancy had expired and that other judges with jurisdiction were in existence, the Supreme Court held that "as to the April term, he was judge *de facto,* if not *de jure,* and his acts as such are not open to collateral attack," citing *Norton* v. *Shelby County, supra, Manning* v. *Weeks, supra, Clark* v. *Commonwealth, supra, Fowler* v. *Bebee,* 9 Mass., 231; *Commonwealth* v. *Taber,* 123 Mass., 253; *State* v. *Carroll,* 38 Conn., 449; *Keith* v. *State,* 49 Ark., 439; *People* v. *Bangs,* 24 Ill., 184.

Some of the decisions of this court have already been referred to in this opinion. The rule that acts of officers *de facto* are valid as to third persons and the public and that the competency, eligibility or authority of a public officer exercising his office in fact, although not a *de jure* officer, may not be collaterally attacked or inquired into by third parties affected has been announced and reaffirmed in an unbroken line of opinions of this court. In the course of his opinion in *Heard* v. *Elliott,* 116 Tenn., at page 155, Mr. Justice NEIL has listed many Tennessee authorities. Others to the same effect will be found in Notes 10 and 11 under Section 444 of Shannon's Code. We deem it unnecessary to extend this opinion by further citation and enumeration of these authorities. Suffice it to say that Tennessee is in line with the courts of England, the United States and practically all of the State courts.

The latest case in this State which considers the *de facto* rule is *Beaver* v. *Hall,* 142 Tenn., 416, wherein Mr.

Justice McKinney extends the rule to courts operating under statutes later declared unconstitutional. This exhaustive opinion is replete with recognition and approval of the universal application of the *de facto* rule to acting judges and officers, the only division or debate was with respect to its extension to the courts themselves. What he forcefully says of the results flowing from a contrary view is applicable here: "Can it be said of those who were tried and acquitted that, where the statute of limitation has not intervened, or even where they were convicted and have served a jail sentence, they can now be indicted in the Circuit Court of Tipton County and convicted again for the reason that all former proceedings were an absolute nullity? Can the sheriff who incarcerated defendants by virtue of *mittimuses* issued to him by said court be held liable for false imprisonment because everything done by said court was absolutely void?"

One other supporting Tennessee case will be mentioned. In *Brewer* v. *State,* 74 Tenn., 198, a conviction for rape, in which case a special judge elected by the bar presided, the court applied the *de facto* rule. The opinion proceeds: (P. 203) "It is next argued that the special judge elected at the May term, had no power to adjourn the court over to a day not appointed by law to hold the court. The statute expressly confers upon a special judge 'all the power and authority' of the regular judge: Code, Sec. 3925. Under the Code, Sec. 4222, it is every day's practice for a judge to adjourn his court in his sound discretion, or to resume business after a failure to hold court for any cause during a reasonable interval of time. And if it be conceded that a formal order of adjournment for a period of two weeks was *ultra vires,* the court, if

actually held at the time designated, would be a court *de facto,* and its proceedings valid: *Venable* v. *Curd,* 2 Head, 582. Even if the appointment had been of a special term, the business being formally continued to that term, the forfeiture might, it seems, have been taken: *Elms* v. *State,* 10 Humph., 127; Code, Sec. 4221. Nor does the fact that the term of another court of the circuit commenced in the interval, affect the result. This very point arose and was decided in favor of the validity of the proceedings in *Cheek* v. *Merchants National Bank,* 9 Heisk., 489. The decision was based upon the principle of *Venable* v. *Curd,* and, to use the language of NELSON, J., 'public justice demands that the views announced in that case shall apply as well to criminal as to civil cases.' *Henslie* v. *State,* 3 Heisk., 206.''

It may be observed from this extended review of the authorities that the exceptions recognized in the application of the general rule may be thus summarized:

(1) Where the attack was direct on the right of the person acting, or affected.

(2) Where the legality of the court was denied.

(3) Where the original entry of the office was forcible, or fraudulent.

(4) Where the act, or exercise of the office, was single, continuity being lacking.

(5) Where the assumption of office was in bad faith, with knowledge of infirmity of authority by the person undertaking to act and by the public.

(6) Where a judge *de jure* was in actual present possession and occupancy of the office, in fact functioning in discharge of its duties.

The battles have waged chiefly about the original appointment and induction—or the eligibility and compe-

tency of the officer—or the constitutional existence of the office or court. None of these considerations enter here. We have before us a case only of a holding over in good faith and with general acquiescence, beyond a term limit fixed by judicial construction—and no authority recognizes the right to attack collaterally judicial acts under such conditions.

 On a former day (July 19, 1929) this court reversed a judgment of conviction in the case of *Ed Grace et al.* v. *State,* coming from Shelby County Criminal Court, in which the indictment was found by the same grand jury, organized on the same day as in this case, by Special Judge Wallace. Announcing in that opinion that (1) conviction for crime must be preceded by presentment or indictment, and (2) that a conviction may not constitutionally rest on a charge preferred by a grand jury illegally selected, and (3) that a grand jury organized by a court without authority of law is not legally empowered to act—the holding in *Low* v. *State, supra,* that the authority conferred by election of a special judge expires with the term at which he is chosen, was given application.

A petition to rehear was filed in that case and has today been granted, and the judgment below affirmed, the majority of the court, upon further and fuller consideration, having reached the conclusion hereinabove indicated, that this special judge was a judge *de facto,* and his acts as such valid.

While in the original opinion in the case of *Grace et al.* v. *State,* it was said that the power of the special judge under his appointment in December ended with the term, following *Low* v. *State, supra,* "leaving him without colorable claim to the office and without any such color

of authority as might sustain his acts at a subsequent term upon the theory of a judge *de facto,*" it is apparent that the statement just above quoted, which is the only reference in the opinion to the *de facto* rule, is not supported by the decision in the Low case. In the first place, the applicability of the *de facto* rule was neither considered nor passed on in that case, and in the second place, it could not have been properly applied, since the essential elements of reputation and continuity were wholly lacking.

In the Low case the "occasion" was the incompetency of the regular judge to try a particular case or "cause," coming within the conditions provided for by the statute arising when the regular judge "cannot properly preside in a cause or causes pending in such court"— while in the case at bar the "occasion" or exigency arose out of the absence of the regular judge on account of illness, provided for in other language of the statute. In that case, the functions and authority of the special judge were restricted to a single and specific "cause," and his final hearing of this "cause" was at another and distinct term of the court, when much time had intervened during which he did not occupy the office, and when the regular judge sat. The situation was wholly unlike that here presented, where the judge was elected to sit in all cases coming on for disposition during the absence and disability on account of illness of the regular judge; and where it appears that this occasion or exigency continued without a break or intermission, from the day of his election to the day of the exercise by him of the duties of the office in organizing the grand jury.

In the Low case the special judge, when he undertook to act at a subsequent term, had, of course, acquired no

reputation as the judge of that court, and, as we have seen, reputation is a basic essential underlying the *de facto* doctrine.

The judgment is affirmed.

### DISSENTING OPINION.

COOK, J., delivered the dissenting opinion.

The law should be declared as written, otherwise judicial declaration is the will of the judge, not the law of the State. In brushing away the artifices of the law called technicality, courts should not open the way for extrajudicial determination of rights involving life, liberty and property. Courts are to declare the law as written and when the State, speaking through the courts, goes about enforcing the law, the law should be observed as written and not made for the occasion.

In this dissenting opinion the law is stated as I conceive it. The discussion involves the question of whether or not the trial court had jurisdiction to try Mrs. Ridout, sentenced to imprisonment from three to ten years for killing her husband, and Ed Grace, Freeman Turnbow Gunion and George Washington Prince, sentenced to death upon a charge of killing J. E. Levey.

In the opinion filed July 19, 1929, the court unanimously agreed that under appointment for the occasion at the September term the powers of the judge selected under section 5730 ended with that term, leaving him without colorable authority to open and hold the subsequent term. The court observed the law as written into our statutes and as declared in *Low* v. *State*, 111 Tenn., 81. A majority of the court receding from the conclusion reached at the December term, 1928, now grant the State's petition to rehear and hold that the indictment reported by a

grand jury organized under the direction of Mr. Wallace is valid, with the result that Mrs. Ridout is sentenced to prison, and Grace, Gunion and Prince are sentenced to death.

I am constrained to adhere to the original opinion for the reasons there stated and herein amplified. I am unable to determine from the opinion of the majority, especially when the supporting authorities are reviewed, whether judicial power is attributed to Mr. Wallace as a *de facto* judge, or a duly elected special judge whose powers were conferred upon his selection by the bar, for the occasion to temporarily preside at the September term, or as a special judge holding over after expiration of his term of office. However that may be, the result is to overrule *Low* v. *State, supra,* and give to the statute a construction inconsistent with that case and others to be mentioned.

We should not let the impatience of this era of modernity—it will pass away—demanding quick action, uncontrolled after the manner of an ancient despot or a Turkish Cadi of medieval times, destroy fundamentals. We must recognize courts as the repository of the State's judicial power, and that a court consists of the totality of its parts, which includes a judge, and that an indictment is an accusation by the State through a grand jury legally called by a court of competent jurisdiction, presided over by a person legally authorized to exercise judicial power in the manner and at the time and place appointed by law.

As said in *Dunn* v. *State,* 2 Ark., 229, and in *Brumley* v. *State,* 20 Ark., 77, the time and place designated by law and the presence of the judge there acting judicially are the union and combination of circumstances which constitute a court.

It was said in our case of *Mengel Box Co.* v. *Fowlkes,* 135 Tenn., 206:

"The term as defined by Mr. Bouvier in his Law Dictionary (quoted by this court in *Railroad* v. *Crider,* 91 Tenn., 489, 505, 19 S. W., 618, 622), is this:

" 'The presence of a sufficient number of the members of a body in the government, to which the public administration of justice is delegated, regularly convened in an authorized place, at an appointed time, engaged in the full and regular performance of its duties.' "

An indictment is necessary to give courts jurisdiction over persons accused of crime. It is uniformly held under constitutional provisions similar to Article I, section 14 of the Constitution, that a court cannot acquire jurisdiction without an indictment or presentment, and that trial, conviction and punishment without such formal and sufficient accusation are void. *Howard* v. *State,* 143 Tenn., 539; *Bob* v. *State,* 7 Humph., 129; *Ex parte Bain* v. *State,* 121 U. S., 1, 31 C. J., pp. 559-574.

Whatever may be said as to the lack of necessity for such formal accusations by a legally constituted grand jury, the requirement is embedded in our system of constitutional government. It was designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusations, whether coming from the government or prompted by the partisan passion, private enmity, or overzeal of public prosecutors and small groups who, through clamor or otherwise, possess the power of overriding the reasonable exercise of official judgment and discretion; and so the requirement of a formal indictment or presentment by a grand jury appointed by a legally constituted court is justly regarded

as one of the securities of the innocent against hasty, malicious and oppressive prosecutions.

The State of Tennessee established by law in Shelby County courts with jurisdiction over crimes and misdemeanors, and enacted laws through which judges are commissioned to hold them. The statutes (Shannon's Code, 137; chapter 351, Acts of 1907) provide that for the administration of justice in the Criminal Courts of Shelby County terms shall be held by both Divisions I and II beginning on the third Monday of January, May and September each year. By chapter 445, Acts of 1909, the presiding judge of Division I is empowered to institute the grand jury for each term as an adjunct of his Division; if the judge of Division I is absent or disqualified, the power is extended by the statute to the judge of Division II.

Judge J. Ed. Richards was the duly commissioned and presiding judge of Division I and Judge Thomas W. Harsh was the duly commissioned and presiding judge in Division II on January 16, 1928. The record shows, without suggesting the source of his authority, that the Honorable Phil Wallace, Special Judge, assumed judicial power in Division I on January 16, 1928, the first day of the January term, and on that date formed the body that preferred the charge upon which plaintiffs in error were tried.

Judicial power is a sovereign power exercised through a mandate from the State and the exercise of that power by any other person than the judge must be supported by the sanction of the State. The record affords no authoritative or colorable source to support the assumption of judicial power by Mr. Wallace on January 16, 1928. Subsequent to that date, on Monday, March 12, 1928, and under the caption of the January term, Mr. Wallace was

selected by the bar, under section 5730 of Shannon's Code, to preside as special judge in Division I.

Referring to another record, that of *Grace et al.* v. *The State,* pending on petition to rehear, it may be seen that Mr. Wallace was selected by the bar under the foregoing section to preside as special judge in the absence of the regular judge on Monday, December 12, 1927. But that was done under the caption of the September term, 1927.

On February 9, 1928, under the caption of the January term, Mr. J. P. W. Hamner was elected by the bar to serve as special judge under authority of the statute mentioned. The selection of Mr. Wallace as special judge at the September term, 1927, was for the occasion, that is for the term at which the election was held, and his authority expired upon adjournment of the term. He was again chosen by the bar to act as special judge on March 12, 1928. His power as special judge, beginning March 12, 1928, could not relate back to the first day of the January term and lend colorable authority necessary to support his acts as a *de facto* judge.

Judicial proceedings, in courts presided over by persons duly elected but disqualified for office, or persons holding under irregular appointment, are sustained upon grounds of public policy as the acts of *de facto* judges under rules illustrated in many cases, among them *Nashville* v. *Fisher,* 1 Shan. Cas., 345; *Bates* v. *Dyer,* 9 Humph., 162; *Venable* v. *Curd,* 2 Head, 582; *Blackburn* v. *State,* 3 Head, 690; *Wood* v. *State,* 2 Cold., 605; *Nashville* v. *Thompson,* 12 Lea, 344; *Calloway* v. *Sturm,* 1 Heisk., 765. But the rules applied in those cases cannot extend to persons who merely assume an office. In such case they are classed as usurpers. A usurper is one who takes possession of an office without authority and his acts are void

for all purposes. *State ex rel. Amringe* v. *Taylor,* 12 L. R. A., 202; *State* v. *Hart,* 7 A. L. R., 1778.

A *de facto* judge is one who exercises power' under color of authority. None of the incidents required to consutute a *de facto* officer as that term is defined in *Heard* v. *Elliott,* 116 Tenn., 150, attended Mr. Wallace's assumption of judicial power. Duly commissioned judges empowered by law to hold the courts and to organize a grand jury and receive indictments occupied both positions in the Criminal Court of Shelby County and left no room for the intrusion of a *de facto* judge. *McCahan* v. *Leavenworth,* 8 Kan., 437.

In Mechem on Public Officers, section 322, it is said: "It is evident that two different persons cannot, at the same time, be in the actual occupation and exercise of office for which one incumbent only is provided by law. There cannot be an officer *de jure* and another officer *de facto* in possession of the same office at the same time. Hence if the officer *de jure* is in there is no room for an officer *de facto;* and if the officer *de facto* is in the officer *de jure* cannot be in also."

It does not appear that the activities of a special judge were necessary. Assuming the necessity, it does not appear that Mr. Wallace was elected special judge to preside over the court assembled on the first day of the January term. In our consideration of the case it was suggested that the indictment might be valid as the act of a *de facto* grand jury.

No consideration of public policy would justify the conclusion that a member of the bar or other person by merely assuming the judge's position could clothe himself with the power of a judge, and by such unauthorized act could institute either a legal or a *de facto* grand jury.

A grand jury is composed of citizens drawn from the body of the people at each term of the court and at the expiration of the term its powers cease. 31 C. J., 579. The body is dissolved and its members, without carrying any official power, return to the mass from which they came.

There was no *de jure* grand jury from which the body acting under appointment of Mr. Wallace could derive the colorable authority required to constitute a *de facto* grand jury. The principle is illustrated in *State* v. *Stevens,* 92 N. W., 420; *Prescott* v. *Haynes,* 42 N. H., 56; *Hildreth* v. *McIntyre,* 42 Ky., 206.

When a grand jury is not organized by sanction of the court but is organized say by the clerk or bailiff in the absence of the judge, or if so imperfectly organized as to consist of, suppose we say one member, or any number less than that required, it is not a grand jury, and unless we should hold that the accused could be arraigned and tried upon an accusation from an unauthorized source, or upon no indictment at all, then all of the proceedings in this case must be held void.

It was also suggested that the indictment might be sustained upon the theory that it was found by a grand jury acting in a *de facto* court. There was a *de jure* court ready to function. So why supplant it with a *de facto* court in order to sustain an invalid indictment?

In *Beaver* v. *Hall,* 142 Tenn., 416, the judgment of a court was given force as that of a *de facto* court upon the principle that a court was created by statute and until that statute was declared void through an appropriate judicial proceeding, the court created by the statute could function as a court and its decrees would be binding

upon those who submitted to its jurisdiction without directly challenging the validity of the creating statute.

The conclusion rests upon the presumption favoring the validity of all solemn legislative enactments and their binding effect until they are declared void. In such cases it is said that the statute, though unconstitutional, is the mandate of the sovereign speaking through the legislative department, and so long as it remains unchallenged such statute gives colorable authority to those acting in good faith under them and are binding upon those who submit without challenging their validity. That rule, however, cannot be extended to unauthorized acts of individuals who assume judicial power without colorable right. Individuals cannot establish courts *de jure* nor courts *de facto,* nor can they assume judicial authority and by the mere act of assumption create either *de jure* or *de facto* juries or other *de facto* officers. *Prescott* v. *Haynes, supra; Beincourt* v. *Parker,* 27 Tex., 558.

It is a far reach from a holding that sanctions the exercise of judicial power, under an unconstitutional statute solemnly enacted by the legislative department of the State, creating in good faith a court and providing for the appointment of a judge, where rights are determined before a decree declaring the Act unconstitutional, to a rule giving validity to an unauthorized usurpation of judicial power. The latter is not entitled to judicial indulgence in a government of law.

"The law of the land" means that the State shall observe its own laws when exercising power. While courts should not create and apply niceties of practice and procedure that afford loopholes for the escape of criminals, they should see that the State, when exercising power—the power over life, liberty and property of citizens—

should observe its own laws. That power can only be exercised through duly constituted courts of justice. Expediency may suggest that the courts should wink at extrajudicial methods and to breaches of the fundamental law in order to accomplish social vengeance as a means of deterring crime, and excuse the illegal act by the schoolboy promise of "this time only." But the doctrine of *stare decisis* is too deep-rooted. The judicial breach of duty would produce a precedent for successive precedents, and the accumulation would invite a train of evils reflecting discredit upon courts and ultimately undermining the judicial structure.

It was urged in both cases that defendants waived the defect of indictment by failure to enter a motion to quash, and by failure to point out the defect by motion in arrest of judgment.

The defect appearing in this record does not relate to any formal matter attending the organization of the grand jury but goes beyond. A grand jury is not a mere assemblage of thirteen persons in the jury room, sent there by whoever may assume the judge's stand in the absence of the judge. It is a constituent element of the court, composed of men drawn, empaneled and sworn in the manner prescribed by law under the superintendence and direction of a judge. A court without jurisdiction over criminal cases could not empanel a grand jury, and jurisdiction means power or authority legally conferred upon a judge authorized to hold a court. Jurisdiction embraces every kind of judicial action on the subject-matter from the finding of an indictment to pronouncing the sentence. 16 C. J., p. 147; 31 C. J., p. 574.

The reason for the absence of the presiding judge is not shown and the authority of Mr. Wallace to open the court

and empanel a grand jury to the exclusion of both judges does not appear.

Ordinarily there is a presumption that legal proceedings are regular. *Sells* v. *State,* 156 Tenn., 610. But the presumption fails when it affirmatively appears as in this record that the acting judge was without authority (*Glasgow* v. *State,* 9 Baxt., 485), and had no jurisdiction to empanel the grand jury and take an indictment. Under such circumstances no valid judgment could follow. *Bob* v. *State,* 7 Humph., 129. The reason is that a court cannot act upon persons who are not legally brought before it. It is the imperative mandate of the Constitution that crimes shall be presented by presentment or indictment and the prisoner cannot waive the requirement. *Rice* v. *State,* 3 Heisk., 215; *Ex parte Bain* v. *State, supra.*

Where the whole proceeding of forming the panel is void, or where the jury is not a jury of the court or term in which the indictment is found, or where the jury has been selected by persons having no authority whatever to select them, or where they have not been sworn, or where some other fundamental requisite has not been complied with, objection to the sufficiency of the indictment may be taken at any time. *United States* v. *Gale,* 109 U. S., 65.

In *Clare* v. *State,* 30 Md., 163, it was held that an inquisitorial body illegally instituted had no power to act and an indictment reported by it was void. In *Cook* v. *State,* 7 Blackf. (Ind.), 165, it was held that an indictment for a capital offense in the absence of the president of the court was void because the statute required his presence. In *Preston* v. *State,* 63 Ala., 126, and *Finley* v. *State,* 61 Ala., 205, the court held that an accusation or the finding of a presentment by an illegally instituted

grand jury was not an indictment, and conferred no jurisdiction on the court to put the accused on trial before a petty jury. A verdict and judgment upon such accusation was held void upon an affirmative showing of the jurisdictional defects, and it was further held that no laches of the accused could be invoked by the State to cure the illegality. See also *State* v. *Gladden,* 13 Fla., 623; *O'Byrnes* v. *State,* 51 Ala., 25; *Harrington* v. *State,* 36 Ala., 236.

The Alabama statute contains a provision similar to that carried into section 7223 of Shannon's Code, which reads:

"No assignments of error or joinder in error is necessary in criminal cases taken to the Supreme Court, but the court shall render such judgment on the record as the law demands."

Referring to this statute, the Alabama Court said in *Finley* v. *State, supra,* that where the record affirmatively shows that a body was organized as a grand jury in violation of law, or without authority, all the acts of such body are void and laches of the accused would not cure the illegality, for the court should render such judgment on the record as the "law demands." The court further said that whatever would be good ground for motion in arrest in the trial court, though not mentioned there, compelled reversal in the appellate court for the error apparent on the record. In accord with this holding are *Sanders* v. *State,* 55 Ala., 183, and 2 Bishop's New Cr. Pro., 889.

This conclusion recognizes that rules of practice are for the furtherance of justice and, being but creations of the court to that end, must give way to positive law. In our cases of *Thornton* v. *State,* 3 Cold., 117, 3 Heisk., 68,

and *Davidson* v. *State,* 2 Cold., 96, the court, referring to the principle underlying the foregoing authorities, said if the court see from an inspection of the record that there was no indictment or its equivalent, a void proceeding through which the indictment was found, the court will arrest the judgment, although no motion in arrest was made in the trial court. This was done in observance of the statute, section 7223 of Shannon's Code.

Where the matter relied on for the arrest of judgment arises from defective pleadings or other mere irregularity, they are waived by defense to the merits and not available on appeal. *Hall* v. *State,* 110 Tenn., 369; *Payne* v. *State,* 130 Tenn., 24.

Motions in arrest are in the nature of demurrers that go to defects of both substance and form shown by the face of the pleadings. Acting upon the presumption that every step in procedure was regular, or that mere irregularities are waived by the accused save when the contrary affirmatively appears, courts refuse to arrest judgments after verdict for errors and omissions that may be waived. But where the objection goes to subversion of all the proceedings taken in empaneling the grand jury, the doctrine of waiver does not apply. *Clare* v. *State, supra; United States* v. *Gale, supra; O'Byrnes* v. *State, supra.*

The constitutional requirement that conviction must follow an indictment cannot be waived. *Rice* v. *State,* 3 Heisk., 221.

The infirmity shown by this record does not relate to mere formal defects in the organization of the grand jury or in the proceedings of a legally instituted grand jury, but go beyond to the jurisdiction of the court.

A review of the authorities, and an application of rules designed to discover the legislative will expressed through statutes, sustains the construction given section 5730, Shannon's Code, by *Low* v. *State.*

The Constitution of 1796 made no provision for temporary or special judges. The power was limited to the regular judges, and so in *Smith* v. *Norment,* 5 Yerg., 271, chapter 37, Acts of 1827, conferring power on the Governor to appoint temporary judges, was held unconstitutional. The court applied the rule that where the Constitution prescribes the manner in which sovereignty shall be exercised, any other mode of executing the power is excluded by implication.

Article VI, section 1, of the Constitution declares that the judicial power shall be exercised by the judges of the Supreme Court and such circuit, chancery and other inferior courts as the Legislature may establish. The Constitution also requires that judges shall be elected by the voters for the definite time of eight years, and the power of judges appointed by the Governor to fill a vacancy ends with the succession of a judge to be chosen at the next biennial election. Confronted by these provisions of the Constitution, the Legislature could not supplant the judges to whom judicial power was there delegated.

To provide for emergencies, Article XI, section 6, was inserted in the Constitution of 1870. It reads: "The Legislature may, by general laws, make provision that special judges may be appointed to hold any court, the judge of which shall be unable or fail to attend or sit, or to hear any cause in which the judge may be incompetent."

Exercising the power thus delegated, the Legislature enacted section 5730 of Shannon's Code. It provides that "when for any cause the judge of a court of record other than the Supreme Court fails to attend, or if in attendance cannot properly preside in a cause or causes, the members of the bar may appoint one of their number to hold the court for the occasion." It is to be doubted if the Legislature could have enacted a law authorizing the members of the bar to appoint a special judge for an indefinite term, and in sustaining the Act against a charge that it was unconstitutional the court said as much in *Hundhausen* v. *Insurance Co.,* 5 Heisk., 707, and *Ligan* v. *State,* 3 Heisk., 162.

In the Hundhausen case the court construing the Act so as to free it from the attack upon its validity said: "It is true the word appointment is used but we think this only means the selection or designation of some one to hold the court or hear any case in which the judge is incompetent," and "the provision is not to enable the Legislature to provide for filling a vacancy in an office, but only to supply a temporary absence of the judge of the court. . . . The Constitution goes on the assumption that the office of judge is filled, but the officer is absent, and to meet such cases the Legislature is left to its discretion to provide for them."

In the Ligan case it is said: "It will be seen that in case of judges of the Supreme Court, the Constitution itself provides for the Governor commissioning men to try and determine the cases in which they are incompetent. But in case of a judge of an inferior court the Legislature is left to make provision that special judges may be appointed to hold any court. It is not a provision for filling a vacancy, and goes upon the assumption

that the office itself is filled by the regular incumbent who fails to attend or sit, or is incompetent to try cases on the docket." The court further said:

"The Constitution did not intend to authorize the filling of the office, but only to allow the Legislature to provide for the temporary appointment·of some one to hold any court when the judge failed to attend and sit or was incompetent."

In *Halliburton* v. *Brooks,* 7 Baxt., 318, the court held that the substitution was a temporary expedient designed for the convenience of suitors and the bar. That the substitute selected under section 5730, Shannon's Code, was temporary and that his powers ended with the term for which he was selected was recognized by the Legislature in the subsequent enactment of Shannon's Code, section 5724, providing for the appointment of special judges by the Governor, and expressly conferring upon them the power of the regular judge, with authority to continue holding the court or courts until the regular judge resumed his duties.

With this background the court said in *Low* v. *State,* 111 Tennessee, that the Legislature did not intend to authorize attorneys of the court to elect one of their number to hold the office of special judge for a longer time than the particular time at which he was elected. This is followed in *Harness* v. *State,* 126 Tenn., 365, by the statement: There is a vast difference between acts of a special judge who undertakes to hold court after the occasion for which he was elected has passed, where he is without a shadow of authority, and the acts of a special judge duly elected and qualified in every respect, except as to his failure to take a now relatively unimportant part of the oath prescribed for public officials.

A comparison of the Kentucky statutes and ours providing for the selection of a judge for the occasion shows a similarity that calls for reference to cases in the State holding that the selection of a special judge for the occasion means for the term, and after expiration of the term his powers cease and judgments of a court over which he may thereafter preside are void. *Childers* v. *Little,* 96 Ky., 376; *Small* v. *Brooks,* 109 Ky., 652; *Kentucky Union Co.* v. *Bailey,* 174 Ky., 488.

From the foregoing authorities it is apparent that the powers of an attorney selected by the bar for the occasion are by law limited to the term, and that he cannot project the transient judicial power given for the occasion into another term nor exercise it on any other occasion or at any other place. His unauthorized act at another place or for another occasion cannot be recognized as the act of either a *de jure* or a *de facto* judge. Mere assumption of power cannot give color to an unauthorized judicial act upon grounds of public policy from which the *de facto* theory arises. Mere claim to be a judge does not constitute one a *de facto* judge. There must be some claim of right to the office, or else performance of its duties so long acquiesced in by the public as to raise a presumption of colorable right. *Hamlin* v. *Kassafar,* 15 Oreg., 456; *Wilcox* v. *Smith,* 21 Am. Dec., 213; *Hildreth* v. *McIntyre,* 19 Am. Dec., 63.

Nothing in the record shows that Mr. Wallace was elected by the bar under section 5730 or appointed by the Governor under section 5733 of Shannon's Code when he opened the court and organized the grand jury on the third Monday of January. Assuming that he was elected by the bar December 12th during the September term, as shown in the record in the Gunion case, it can-

not be held without overruling *Low* v. *State*, that his judicial power extended to the January term.

For the reasons stated, I am of the opinion that the indictments upon which these defendants were tried are void, and that their judgments of condemnation should have been reversed. In this conclusion MR. CHIEF JUSTICE GREEN concurs.